MASSACHUSETTS AUTOMOBILE RATING AND ACCIDENT
PREVENTION BUREAU & others *vs.* COMMISSIONER
OF INSURANCE
(and a companion case).

Suffolk. May 7, 1981. — August 11, 1981.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Insurance,* Motor vehicle insurance, Commissioner of Insurance, Rating.
*Administrative Law,* Judicial review.

Under G. L. c. 175, § 113B, this court's review of a decision of the Com-
missioner of Insurance establishing automobile insurance rates is
limited to a determination whether the rates so established are "ade-
quate, just, reasonable and nondiscriminatory" and are reasonably
supported by the evidence. [336-337]
In a proceeding to establish automobile insurance rates for 1981, it was
within the power of the Commissioner of Insurance to apply a compe-
tition adjustment factor in determining the provision for expenses be-
cause of the great variation in expenses reported by individual compa-
nies. [337-338]
In a proceeding to establish automobile insurance rates for 1981, there
was sufficient evidence to warrant a finding by the Commissioner of
Insurance that the deterrent effect of the merit rating program estab-
lished by G. L. c. 175, § 113P, would reduce the frequency of proper-
ty damage and collision claims in 1981 below that in 1979. [338-339]
In a proceeding to determine the underwriting profit allowance for 1980
automobile insurance rates and to establish the 1981 automobile insur-
ance rates, the Commissioner of Insurance was warranted in selecting
a "capital asset pricing model" to fix the target rate of return; there
was no merit to the companies' contentions that the model used was in-
adequate because it measured only "systematic" and not "unsystemat-
ic" risk and that the Commissioner's method of estimating the value
for "beta of liabilities" was unreliable. [339-344]
In a proceeding to establish automobile insurance rates for 1981, the
Commissioner of Insurance did not violate the requirement of G. L.
c. 175, § 113B, that the rates be nondiscriminatory by allocating
equally among classification cells excess losses attributable to high risk
insureds covered by policies ceded to the Massachusetts Motor Vehicle

Reinsurance Facility rather than allocating the losses on the basis of the actual loss experience of each classification. [344-346]

Evidence presented by automobile insurance companies that they had sustained substantial underwriting losses for 1979 and 1980 was insufficient to support their claim that the rates set by the Commissioner of Insurance for 1981 were unconstitutionally confiscatory. [346-347]

CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk on January 2 and January 12, 1981, respectively.

The cases were reported by *Kaplan, J.*

*Acheson H. Callaghan, Jr.* (*Scott P. Lewis & Douglas H. Wilkins* with him) for the plaintiffs.

*Donald K. Stern,* Assistant Attorney General (*Stephen S. Ostrach & Paul W. Johnson,* Assistant Attorneys General, with him) for the defendant.

HENNESSEY, C.J. This is a reservation and report by a single justice of this court of two cases arising out of decisions by the Commissioner of Insurance (Commissioner), fixing and establishing 1981 automobile insurance rates and the profit provisions in the 1980 rates. The plaintiffs are the Massachusetts Automobile Rating and Accident Prevention Bureau (bureau) and named insurance companies (companies) who brought complaints under G. L. c. 175, § 113B, relating to each decision. One complaint seeks review of the Commissioner's decision establishing 1981 automobile rates. The other complaint seeks review of the Commissioner's decision establishing profit provisions in the 1980 automobile insurance rates, following the decision of this court in *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.,* 381 Mass. 592 (1980), which reversed and remanded the Commissioner's decision establishing 1980 rates for redetermination of the underwriting profit provisions.

This court's 1980 decision was issued during the hearing on 1981 rates, after the parties had introduced considerable evidence on the profit issues. Following the close of testimony on all other issues, the Commissioner held a separate

hearing on the profit issues (the remand hearing). The parties stipulated that evidence on the profit issues introduced as part of the 1981 record could be considered in redetermining the 1980 profit provisions, and that evidence introduced during the remand hearing could be considered in setting the 1981 profit provisions. Thus there is one consolidated record on the profit issues. The Commissioner's 1980 remand decision, which was incorporated by reference in his 1981 decision, contains virtually his entire discussion on the profit issues as they affect both 1980 and 1981 rates.

The plaintiffs seek review in both cases under the statutory standards applicable to review of insurance rate decisions. The plaintiffs also allege that the 1980 rates, even after the remand decision, and the 1981 rates are confiscatory and unlawful. The plaintiffs do not seek to introduce additional evidence in support of these claims and thus their constitutional claims stand on the same record as their statutory claims.

The plaintiffs' claims of confiscation are based on the following facts and allegations from the record. In 1979 the companies claim an aggregate underwriting loss of $97,500,000. This is a claimed loss of 13.7 per cent, compared with the over-all underwriting profit provision in the 1979 rates of a negative 2.5 per cent. In 1980 the companies claim an underwriting loss of more than $82,000,000, even after the increase ordered in the 1980 remand decision. This estimate of the 1980 underwriting loss is based on the 1979 experience, the trend factors from 1979 to 1980 assumed in the Commissioner's 1980 decision and the 3.5 per cent increase in premium contained in the 1980 remand decision. This is a claimed loss of approximately 10 per cent, as compared with the over-all underwriting profit provision in the 1980 rates, after remand, of a negative 1.76 per cent. Thus the claim in that the 1980 rates will be inadequate by more than eight points, or $67,000,000, measured by the standard of adequacy adopted by the Commissioner in his 1980 remand decision. Since the 1981 rates are only 7.1 per cent higher than the 1980 remand rates, the claim is

that the increase, therefore, is not even enough to make the rates adequate for 1980, without allowing for increase in losses and expenses between 1980 and 1981.[1]

The plaintiffs assert error, generally, in the methodology followed by the Commissioner, and they also argue that the evidence was insufficient to support his findings, and his findings were inadequate. In pursuing these assertions, the plaintiffs present argument for a demanding standard of review.

More particularly, the plaintiffs allege error in the Commissioner's findings as to profit provisions for 1980 and 1981; in his reduction of 1981 property damage rates for the supposed further effects of the merit rating program in 1980; in his reduction of the provisions for company expenses without establishing standards for either the need for or the magnitude of the reduction; and in his failure to establish rates which are nondiscriminatory as among various rating classifications. Further, it is alleged that the Commissioner's decisions fail to establish rates for 1980 and 1981 which are adequate, just, and reasonable as required by the statute, G. L. c. 175, § 113B, and that the decisions are confiscatory and are therefore unconstitutional.

We uphold the Commissioner's decision in all respects.

1. *Standard of Review.*

This court's review of the Commissioner's decision is limited to a determination of whether the rates are "adequate, just, reasonable and nondiscriminatory."[2] G. L. c. 175, § 113B. The court does not substitute its judgment as to the reasonableness or adequacy of the premium charges for that of the Commissioner. *Massachusetts Bonding & Ins. Co.* v. *Commissioner of Ins.,* 329 Mass. 265, 273 (1952). *Insurance Rating Bd.* v. *Commissioner of Ins.,* 359

---

[1] The 1981 decision leaves the calculation of the actual 1981 rates to the parties. Thus numbers or calculations which refer to the 1981 rates cannot always be found in the decision itself, but can be calculated from the factors established by the decision.

[2] The standard of review is different, of course, for the constitutional claim of confiscation, as discussed *infra.*

Mass. 111, 117 (1971). Judicial inquiry is limited to whether the rates set by him have reasonable support in evidence.

Further, the Commissioner is obliged to make findings to indicate the over-all basis for his decision. See G. L. c. 175, § 113B; *Insurance Rating Bd.* v. *Commissioner of Ins., supra* at 118.

The plaintiffs urge that the court has a duty to take a "hard look" at all the technical aspects of the evidence (see, e.g., *Pikes Peak Broadcasting Co.* v. *FCC*, 422 F.2d 671 [D.C. Cir.], cert. denied, 395 U.S. 979 [1969]), and they also argue that the Commissioner is obliged, and has failed, to make findings on all contested issues. Cf. G. L. c. 30A, § 11 (8). We reject the position of the plaintiffs to the extent that they appear to argue toward a substitution of this court's judgment for that of the Commissioner, or toward a de novo weighing of the evidence by this court on controverted issues. The plaintiffs are entitled to a review by this court of the evidence and the findings in accordance with the established standards, *supra*, and in doing so we shall give due weight to the experience, technical competence and specialized knowledge of the Commissioner, *Attorney Gen.* v. *Commissioner of Ins.*, 370 Mass. 791, 795 n.4 (1976), as well as the discretionary authority vested in him.

2. *Provision for Expenses.*

For at least three years the record of industry expenses, as reported by the companies themselves, has shown a great variance between individual companies. The Commissioner, by use of the competition adjustment factor, has consistently taken the position that this variation shows that expenses are not being adequately controlled by those companies with the highest expenses. In 1979, the Commissioner applied a multiplicative factor of 0.95 to adjust the otherwise derived expense pure premium. The 1980 record showed a similar pattern of extreme variation in expenses among various insurance companies. Accordingly, the Commissioner determined that an adjustment factor of 0.85 was justified. However, since that factor was so much lower than the previous year's adjustment factor of 0.95,

the Commissioner stated that it was desirable to avoid abrupt changes in comparable rate elements, and he chose to use an adjustment factor of 0.90, instead of the 0.85 supported by the evidence. The industry challenged that action as being both legally improper and as being unjustified by the record. This court rejected both claims outright, stating: "Where a particular item of cost varies widely from company to company and the Commissioner is fixing industry-wide rates, he must be allowed considerable discretion to exclude the highest costs from consideration, even though he cannot prove how they could be reduced." *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 381 Mass. 592, 603 (1980).

The evidence applicable to the 1981 rates again shows great variation in expenses among the companies. We reiterate our conclusion of 1980 that the Commissioner's decision to treat this problem by continuing to impose the competition adjustment factor is within his power, and is justified by the evidence.

3. *Adjustment for Merit Rating.*

The industry challenges the Commissioner's finding that the deterrent effect of the merit rating program will reduce the frequency of property damage and collision claims in 1981 below that in 1979, thus reducing the losses which insurers will experience.

Effective November 1, 1976, G. L. c. 175, § 113P, inserted by St. 1976, c. 266, § 18, requires that surcharges (or penalties) be imposed at various levels upon insured persons who are at fault in motor vehicle accidents or are convicted of moving violations of motor vehicle laws. The surcharges are relatively substantial for various offenses or repeated offenses, varying from assessments of $50 each year for three years, up to $675 a year for like periods.

The Attorney General had shown comparative evidence as to claim frequencies nationwide, as compared to Massachusetts claim frequencies, in order to isolate merit rating as a causal factor. Actuarial evidence was presented for analysis and adjustments of the evidence. Even though the

plaintiff presented opposing evidence as to the effect of merit rating, purporting to show that there was no downward effect in claim frequency in the absence of adjustments, there was reasonable support in the record for the Commissioner's decision to accept the approach and recommended adjustments proffered by the Attorney General. So also, the Commissioner's findings were adequate.

4. *Allowance for Profit.*

In fixing the underwriting profit allowance for 1980 rates, the Commissioner followed the general method used in setting 1976 rates approved by the court. See *Attorney Gen.* v. *Commissioner of Ins.*, 370 Mass. 791, 812-822 (1976). The method requires the establishment of a "target rate of return" from which is subtracted investment income (derived from premium cash flow and capital) yielding the underwriting profit allowance.

The objective is "to fix an allowance for underwriting profit which, when added to investment income, would yield a return on shareholder capital comparable to that of unregulated industries of comparable risk." *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 381 Mass. 592, 605 (1980). In its initial challenge to the setting of the 1980 rates, the bureau did not attack the Commissioner's setting of the target rate of return; it attacked the Commissioner's determination of anticipated investment income. We disapproved the underwriting profit allowance because the investment income projected by the Commissioner lacked evidentiary support. *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 381 Mass. 592, 608-609 (1980). Since we were unable on the record before us to determine what the allowance should have been, we remanded the case to the Commissioner to recalculate the profit allowance in accordance with our opinion. *Id.* at 609.

The Commissioner conducted additional hearings and issued his "Opinion, Findings and Order on 1980 Automobile Insurance Rates" (remand decision). He recomputed the underwriting profit allowance increasing the provision

for bodily injury from a negative 13% to a negative 10.3% and the provision for property damage from a negative 2% to a positive 1.9%.[3] In his decision on 1981 rates, the Commissioner followed his remand decision in fixing underwriting profit allowances (with adjustments to take into account the most recent information then available).

The Commissioner, in his remand decision as well as his decision on 1981 rates, reverted to the so called "statutory/regulatory company" to project investment income. This model assumes a hypothetical insurance company that invests only in Treasury securities and is taxed at the appropriate rate (46%). The Commissioner made no allowance for investment income received from riskier securities even though we noted that the return on investments to real-world insurers is greater than projected using a hypothetical insurer that invests only in risk-free securities. *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins., supra* at 608. We would have approved "an upward adjustment based on actual recent portfolios, fairly projected yields, and applicable actual tax rates." *Id.* at 609. However, the Commissioner decided to adopt a conservative position (and one more favorable to the plaintiffs) in determining investment income, since we had also stated in effect that we would approve a computation based upon a statutory/regulatory company. *Id.*

The bureau now challenges the recalculated underwriting profit allowance for the 1980 rates as well as the allowance for the 1981 rates. In this appeal it assails the Commissioner's calculation of the target profit. The thrust of the bureau's argument is that the "capital asset pricing model" (CAPM), used by the Commissioner to fix the target profit, is inadequate.

Derived from modern financial theory, the CAPM has been applied by Dr. William B. Fairley, a former staff member of the Division of Insurance, to calculate under-

---

[3] The provisions frequently are expressed in negative allowances, since investment returns, when added, will serve to reach the target returns.

writing profit allowances for automobile insurance rates. It provides a sophisticated methodology for projecting returns to insurers, adjusted to account for various risks.

In selecting CAPM the Commissioner found that the model was "on firm ground for use as a system for determining appropriate allowances for underwriting profit"; that its success rate had been tested by economists "for forecasting investment results within tolerable margins of error inherent in all such economic predictors over the recent past few years"; that a form of the model was being used by the insurance industry "in the profit allowance of the workers' compensation rate filings made with the Commissioner"; and that the model was "structured to better predict more consistently reasonable investment results for short term programs." He concluded that "the Fairley CAPM model, used with the Statutory/Regulatory company is the best we have at this time."

In rejecting the model offered by the bureau, the Commissioner stated that it was not as reliable as CAPM, pointing out that premiums set using the bureau's model would reflect investment decisions made many years in the past. The CAPM, on the other hand, "separates out that portion of invested funds attributable to Massachusetts for the 1980 policy year." In addition, he found that the bureau's model lacked logical consistency because, while stating that the insurers in 1980 expected to earn only 10.67% from capital gains and dividends on stocks in their portfolios, it provided for a return to shareholders of 15%. Finally, the Commissioner found that the model lacked precision.

The Commissioner's findings with respect to CAPM and the bureau's model are adequate, and are supported by the evidence. In effect, the bureau's response to the Commissioner's rejection is that, regardless of its flaws, its model is better than the CAPM because, unlike the CAPM, the bureau's model calculates profit allowance on the basis of analyzing actual investment returns of a group of companies writing automobile insurance in Massachusetts. In weighing the relative merits of different methods of calculating

the underwriting profit allowance, the Commissioner has considerable latitude. There is no legal or constitutional requirement that a particular theory or method be used in determining the profit allowance to be used in computing rates. Cf. *Boston Gas Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 98 (1975). Moreover, in a matter such as the choice of methodology, we are guided by principles, referred to *supra*, which require us to give due weight to the experience and expertise of the Commissioner and allow considerable latitude in the exercise of his legislatively-conferred discretion; and which require us to assure that the Commissioner sets rates according to the statutory standard, but not to substitute our judgment for his. Having in mind these important principles of administrative law, we decline the bureau's clearly implied invitation to compare both models in light of all the evidence and to select the one we decide is better. To accept this invitation would amount to usurpation of the Commissioner's authority.

In assailing the CAPM, the bureau raises two main arguments: (a) CAPM is an inadequate and inappropriate model of the relation between risk and return because by definition it only considers one aspect of risk; and (b) the estimates of the crucial parameters of the model used by the Commissioner are based on unrepresentative data and unreliable procedures.

(a) *The risk factor.* The bureau argues that the CAPM is inadequate because it does not measure total risk and therefore understates returns and hence the profit allowance. The model measures "systematic" risk. Drawing on expert testimony and other evidence it introduced at the hearings, the bureau contends that the model is incomplete because it does not take into account "unsystematic" risk. "Systematic" risk measures the risk of variability of return on a market portfolio consisting of all available assets; "unsystematic" risk is that part of an asset's risk unique to the asset, that is, risk not shared with all other assets.

The bureau does not offer numerical values for "unsystematic" risk for use in the CAPM. It simply attacks the model because it considers only "systematic" risk and asserts that its

model takes into account all forms of risk. The Commissioner had before him, however, evidence that the measure of risk used in the model was appropriate and that "unsystematic" risk should not be rewarded because it is not taken into account by the market. In other words, "unsystematic" risk has no quantifiable effect on the returns being calculated. Moreover, by selecting the CAPM over the bureau's model the Commissioner chose not to rely on the bureau's evidence which advanced the theory that CAPM was deficient because it did not take into consideration "total" risk.

(b) *Beta of liabilities.* To calculate the target profit of CAPM requires that values for various parameters be estimated. One parameter is the beta of liabilities. This indicates the riskiness of underwriting automobile insurance as compared to investing in the average stock in the market. Estimation of this value requires estimation of various other parameters: beta of equity, beta of assets, and average period of time insurers have money on hand to invest. The estimates of these parameters, the Commissioner found, were based on recent data determined by observing the performance of real-world insurance companies and their stock portfolios. See *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 381 Mass. 592, 606-608 (1980). Expressly relying on the testimony of Dr. Raymond D. Hill, the Attorney General's expert, the Commissioner used .15 as the value for beta of liabilities. This value means, the Commissioner found, "that underwriting insurance is 15% as risky as investing in the average common stock in the market."

Arguing almost entirely from evidence it submitted at the hearings, the bureau attacks the method Dr. Hill used in arriving at his estimate of the value of the liability beta. We find Dr. Hill's estimate, adopted by the Commissioner, to be fully supported by the evidence. Moreover, we defer to the Commissioner's experience, expertise, and discretion in his decision to use Dr. Hill's method for calculating the liability beta rather than the bureau's.

The bureau contends that the sample of insurance companies Dr. Hill used to derive the estimates from which he calculated the liability beta was too small and unrepresentative. The bureau failed to show, however, that using a larger sample of companies would work a materially different result. Dr. Hill used betas from seven property liability insurance companies appearing in the Value Line Investment Survey. In fact, Dr. Hill performed an additional calculation, using the same sample of ten Value Line companies as did Dr. Richard Derrig, the bureau's expert, and arrived at the same answer he got using the smaller sample.

The bureau's remaining arguments in this branch of the case attack the reliability of Dr. Hill's estimation of the liability beta on the basis of evidence submitted by the bureau. The only argument worthy of consideration is that the estimate was not reliable because the liability betas for individual companies varied greatly. However, there was evidence that the variation among companies was not a significant factor in the calculation, and that the important value was that estimated for the industry-wide liability beta, which remained relatively stable when calculated using different samples of companies over different periods of time.

We have addressed the principal arguments advanced by the bureau under this heading. The few remaining arguments, tersely made, are aimed at showing, almost entirely through the bureau's evidence, that the estimation of the liability beta is unreliable. Having considered these additional arguments, we find therein no reason to disturb the Commissioner's selection of .15 as the value for the liability beta.

We conclude that the Commissioner's allowance for underwriting profits for the 1980 rates as well as the 1981 rates has reasonable support in the evidence and that his findings were an adequate statement of his reasoning.

5. *Discrimination Claim.*

The bureau claims that the Commissioner violated the statutory requirement that rates be "nondiscriminatory" by allocating equally among classification cells (a combination

384 Mass. 333                                      345

Massachusetts Auto. Rating & Acc. Prevention Bureau *v*. Commissioner of Insurance.

of territorial and driver classifications), excess losses attributable to high risk insureds covered by policies ceded to the Massachusetts Motor Vehicle Reinsurance Facility (Facility). Underlying this claim is the bureau's assumption that the total loss pure premium (that part of the premium allocated to losses) for each rating classification should be based on the actual loss experience for that classification. While we agree in general with the principle assumed, we note that the Commissioner has discretion to make equitable adjustments in this area to carry out the legislative policy making motor vehicle insurance available to all eligible persons at reasonable rates. G. L. c. 175, § 113B. We conclude that the Commissioner did not abuse his discretion.[4]

The Commissioner allocated the over-all rate level among the various rating classifications, which, the bureau points out, are determined on the basis of loss experiences. He did this by calculating the relativities of the classifications for each coverage. Since he used "total market" data to make the calculations, the relativities reflect all losses (including Facility excess losses). However, he excluded the excess Facility losses before applying the relativities. He then added to the premiums the excess Facility losses (a process called "flat Facility loading"). The bureau argues that the relativities should have been applied to the excess Facility losses also.

The bureau argues that rates must be based on the actual loss experience of each classification. As the bureau recognized, we have held that to be "nondiscriminatory" premiums must be "equitably adjusted and proportioned among the classes in accordance with the respective losses which reasonably are to be anticipated." *Century Cab Inc.* v. *Commissioner of Ins.*, 327 Mass. 652, 663 (1951). We reaffirm this principle, which the Commissioner followed in

---

[4] We assume, without deciding, that the bureau has standing to raise the issue. The question, however, is not free from doubt. Cf. *Town Taxi Inc.* v. *Police Comm'r of Boston*, 377 Mass. 576, 581 (1979); *American Hoechest Corp.* v. *Department of Pub. Utils.*, 379 Mass. 408, 410-411 (1980).

calculating the classification relativities on the basis of *all* losses. We cannot say, however, that he was required to apply the relativities to the excess Facility losses. The rates set by the Commissioner must be "reasonable" as well as "nondiscriminatory." G. L. c. 175, § 113B. He must determine whether in attempting to fix rates that are "nondiscriminatory" he does not fix rates that are unreasonable. Had the Commissioner accepted the bureau's method of allocating excess Facility losses, the differences among the classifications for premiums for the same coverages would have been substantially greater than under the method used.[5] He was entitled to consider these sharp differences in determining the reasonableness of the rates. Moreover, he was bound to consider the legislative policy of making motor vehicle insurance available to all, including high-risk drivers. *Massachusetts Motor Vehicle Reinsurance Facility* v. *Commissioner of Ins.*, 379 Mass. 527, 529 (1980). Cf. *American Mfrs. Mut. Ins. Co.* v. *Commissioner of Ins.*, 374 Mass. 181, 185-187 (1978). We conclude that the Commissioner acted consistently with these legislative concerns and did not exceed the bounds of his discretion in allocating losses among the classifications.

6. *Confiscation.*

The plaintiffs also raise the claim of unconstitutional confiscation. The plaintiffs are entitled to an independent review of facts and law on the constitutional issue. However, it is clear that basic legislative process of ratemaking should not be usurped in the guise of independent review, and our scrutiny should encompass only the ultimate findings and conclusions of the ratemaker. See *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 375 Mass. 571, 574 (1978). The burden is upon the plaintiffs to prove that they are without the opportunity to realize a fair and

---

[5] In its brief the bureau indicates that the "average pure premium" for Territory 20 using the Commissioner's method is $210.31 compared to $259.82 using the bureau's method; and that the "average pure premium" for Territory 2 using the Commissioner's method is $95.90 compared to $85.01 using the bureau's method.

reasonable return and that the inadequate return results directly from the rates set and not from other causes. See *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 371 Mass. 881, 884 (1977).

The plaintiffs seek to substantiate the confiscatory nature of the rates by reliance upon their projection of substantial underwriting losses for 1979 and 1980. We have said that this approach is fundamentally inappropriate because "it is clear that the rates for a given year cannot be argued to be confiscatory because of industry losses in previous years." *Attorney Gen.* v. *Commissioner of Ins.*, 370 Mass. 791, 826 (1976). The assertion that previous underwriting losses is predictive of future confiscatory results must be rejected because, among other considerations, full accounting for the losses, expenses and profits of the current year rebuts any claim of confiscation.

Perhaps just as important, the plaintiffs' proof of past underwriting losses to establish unconstitutional confiscation does not include the substantial income derived from investments which are incorporated in the profit component of the ratemaking computation. Computations which thus demonstrate only that in past years the claims paid, and other valid expenditures, exceeded the total premiums collected, fall far short of proving that the plaintiffs were denied the opportunity of a fair return. "The financial facts of life — not unrecognized in the industry — are that money is made on investments, not on underwriting." *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 381 Mass. 592, 604-605 (1980).

Judgments are to be entered in the county court affirming the decisions of the Commissioner.

*So ordered.*