THE WORKERS' COMPENSATION RATING AND INSPECTION
BUREAU OF MASSACHUSETTS & others *vs.* COMMISSIONER
OF INSURANCE
(and two consolidated cases).

Suffolk. October 6, 1983. — February 23, 1984.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Insurance,* Rating, Workmen's compensation insurance, Commissioner
of Insurance. *Practice, Civil,* Review of decision of Commissioner of
Insurance. *Administrative Law,* Judicial review. *Due Process of Law,*
Rate setting.

Discussion of the scope of authority of the Commissioner of Insurance in
passing upon proposed workmen's compensation insurance rates, and
this court's standard for review of the commissioner's action. [244-246]

The approval of proposed workmen's compensation insurance rates by
the Commissioner of Insurance involves neither a "regulation" nor an
"adjudicatory proceeding" within the meaning of G. L. c. 30A, the
State Administrative Procedure Act. [247]

The evidence before the Commissioner of Insurance in a proceeding to
fix workmen's compensation insurance rates provided sufficient sup-
port for his conclusion that an "unlimited payroll" liability exposure
base program, which removed the $300 per employee weekly wage
cap for determining premiums, would not lead to unfairly discrimi-
natory rates within the meaning of G. L. c. 152, § 52. [248]

Action by the Commissioner of Insurance in removing the $300 per em-
ployee weekly wage cap for determining workmen's compensation in-
surance premiums did not violate insured employers' constitutional
guaranties of due process and equal protection of the laws. [248-252]

This court denied certain procedural motions which, even if they had
been allowed, would not have disposed of any substantive issues
presented by an appeal from action of the Commissioner of Insurance
in a proceeding to fix workmen's compensation insurance rates.
[252-254]

The evidence before the Commissioner of Insurance in a proceeding to
fix workmen's compensation insurance rates provided sufficient sup-
port for the commissioner's finding that a "surplus flow" model for
surplus allocation, as advocated by an insurance rating organization,
would lead to excessive rates. [254-258]

The evidence before the Commissioner of Insurance in a proceeding to fix workmen's compensation insurance rates provided sufficient support for the commissioner's rejection of the "beta of liabilities" contended for by an insurance rating organization as a measure of risk. [258-261]

The evidence before the Commissioner of Insurance in a proceeding to fix workmen's compensation insurance rates proved sufficient support for the commissioner's finding that a simulation method proposed by an insurance rating organization for calculating loss cash flow would lead to excessive rates. [261-262]

The evidence before the Commissioner of Insurance in a proceeding to fix workmen's compensation insurance rates provided sufficient support for the commissioner's conclusion that analysis of medical cost trends by means of an "elasticity" model proposed by an insurance rating organization would lead to excessive rates [262-264], as well as for the commissioner's failure to disapprove the organization's other cost-trend methodologies [265].

The evidence before the Commissioner of Insurance in a proceeding to fix workmen's compensation insurance rates provided sufficient support for the commissioner's approval of a 46% Federal income tax rate for use in the context of a statutory/regulatory insurance company model. [265-266]

Approval by the Commissioner of Insurance of increased rates for workmen's compensation insurance effective January 1, 1983, did not entitle insurance companies to a finding that the rates previously in effect were inadequate during the period when hearings on new rates were held and considered. [266-268]

Failure of the Commissioner of Insurance to approve increased rates for workmen's compensation insurance to be in effect during complex proceedings which culminated in the establishment of higher rates effective January 1, 1983, did not amount to an unconstitutional confiscation of insurance companies' property. [268]

The time taken by the Commissioner of Insurance to schedule hearings and decide the issues in a complex proceeding to fix workmen's compensation insurance rates was not so excessive as to constitute a denial of due process of law. [269-270]

CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk on January 21, 1980, November 24, 1982, and December 6, 1982.

The cases were reported by *O'Connor, J.*

*Acheson H. Callaghan, Jr. (Scott P. Lewis* with him) for The Workers' Compensation Rating and Inspection Bureau of Massachusetts & others.

*Sanford A. Kowal* for Associated Industries of Massachusetts & others.

*Stephen S. Ostrach,* Assistant Attorney General *(Carolyn V. Wood,* Assistant Attorney General, with him) for Commissioner of Insurance.

HENNESSEY, C.J.   This case presents three petitions (hereinafter referred to as complaints) seeking review of decisions by the Commissioner of Insurance (commissioner) issued pursuant to G. L. c. 152, § 52, regarding filings of proposed rates for workmen's[1] compensation insurance.   The complaints were filed with the Supreme Judicial Court for Suffolk County.   A single justice of this court reserved and reported them for decision by the full court.   We uphold the commissioner's decisions on all issues presented.

Associated Industries of Massachusetts (AIM), representing various insured employers, seeks review, in separate actions, of the commissioner's December 31, 1979, decision approving rates effective January 1, 1980, and the commissioner's October 15, 1982,[2] decision disapproving proposed rates.   AIM also seeks to amend its complaint in the latter case to include a challenge to the commissioner's December, 1982, approval of revised rates effective January 1, 1983.   The Workers' Compensation Rating and Inspection Bureau of Massachusetts (bureau), a voluntary unincorporated association of insurance companies licensed by the commissioner under G. L. c. 152, § 52C, as a rating organization with respect to workmen's compensation in-

---

[1] "Workmen's compensation" is the designation provided in G. L. c. 152 for the type of benefits therein provided.

[2] The October 15, 1982, decision was rendered by a deputy commissioner sitting as a hearing officer and affirmed by the commissioner on November 4, 1982.   For convenience, we shall refer throughout most of this opinion to the October, 1982, findings and decision of the deputy commissioner as the October, 1982, findings and decision of the commissioner.

surance, seeks review of the commissioner's October, 1982, decision disapproving proposed rates filed by the bureau. The factual background to each claim is set forth below.

On June 14, 1979, the bureau filed with the commissioner a revision of rates for workmen's compensation insurance policies to be effective August 1, 1979. Public hearings were held to consider the filing. AIM, the bureau, and the State Rating Bureau (SRB) participated in the hearings. The commissioner thereafter disapproved the filing in part because he found there was "not sufficient evidence to enable the Commissioner to establish a range of reasonableness in the unlimited payroll offset . . . ." On December 21, 1979, the bureau filed with the commissioner a general revision of rates to be effective January 1, 1980, and applicable as of the first normal anniversary rating date of each risk which was on or next followed this effective date. AIM then requested that the commissioner hold a hearing on the filing sometime after January 7, 1980, and before he approved the new rates. In a decision issued December 31, 1979, the commissioner found the bureau's December filing remedied the defects in the June 14, 1979, filing and he approved the proposed rates without holding further hearings. In doing so, the commissioner noted the December filing introduced "two major innovations in Workers' Compensation ratemaking." One of these was "the introduction of unlimited payrolls as the measurement of exposure to which the manual rates are applied." AIM then filed a complaint in the Supreme Judicial Court for Suffolk County challenging the commissioner's approval of the December filing. A single justice of this court allowed the bureau's motion to intervene and the bureau and the commissioner filed answers to AIM's complaint. On February 5, 1980, a single justice denied AIM's motion for a stay of the rates. The docket reflects no further effort to resolve the merits of AIM's claim until February 2, 1983, when the bureau and the commissioner filed a joint motion to dismiss the complaint.

On May 6, 1981, a public hearing was held by the commissioner pursuant to a formal request by Construction Industries of Massachusetts, Inc., to consider testimony regarding offset factors and the unlimited payroll base method for determining liability exposure. AIM, the bureau, and SRB participated in the hearing. The commissioner stated that all parties at the hearing generally agreed that the offset factors in the 1980 filing needed revision. The parties, including AIM, then signed a stipulation containing a recalculation of unlimited payroll manual rates "as of January 1, 1981" based on changes in offset factors. The last paragraph of the stipulation provides: "The parties waive any appeal with respect to any issue covered by this stipulation." The stipulation was submitted to the commissioner on January 25, 1982, and accepted by him in his decision dated February 16, 1982.

On September 11, 1981, the bureau filed with the commissioner a general revision of workmen's compensation insurance rates to be effective October 1, 1981 (the 1981 filing).[3] Public hearings on the 1981 filing began on April 15, 1982, and extended through thirty-seven sessions, terminating on July 2, 1982. The bureau, the Attorney General, AIM and the SRB participated in these hearings. On October 15, 1982, a deputy commissioner sitting as a hearing officer issued a decision that the 1981 filing would not be approved as the proposed rates contained in it were "excessive" and did "not conform to the requirements of M. G. L. c. 152, Section 52." In addition she denied a motion to suspend use of the unlimited payroll base. She found insufficient evidence to reverse the prior decision permitting it.

The bureau appealed the deputy commissioner's decision to the commissioner. On November 4, 1982, the commis-

---

[3] On December 18, 1981, the bureau filed another rate revision to be effective January 1, 1982. This December filing was made to adjust new, renewal, and outstanding policies in connection with certain statutory changes. On February 16, 1982, the commissioner approved the December, 1981, filing. The October, 1981, filing was revised to reflect this decision.

sioner issued a decision upholding the deputy commissioner's disapproval of rates proposed in the October, 1981, filing. Both the bureau and AIM sought review of the commissioner's decision by filing separate complaints against the commissioner in this court. The bureau and AIM each filed motions to intervene in the claim brought by the other. Both motions were allowed.

While seeking review of the October, 1982, disapproval, the bureau filed with the commissioner on October 29, 1982, a set of proposed rates revised in light of the October disapproval. The bureau specifically stated in this second filing that it was not waiving its right to appeal the October disapproval.

AIM requested the commissioner to provide further hearings before any new proposed rates were allowed. After a hearing before a single justice of this court, the commissioner asked the parties by letter to present him with any reasonable opinion why the revised rates were not in conformity with the October 15, 1982, decision. A "conference" among the parties was then held to consider AIM's objection to the refiling. The commissioner found "A.I.M. presented no case at the conference, either orally or in writing." The commissioner, on December 23, 1982, ordered the revised filing approved without further hearings, effective January 1, 1983.

Subsequently, on February 23, 1983, AIM filed with this court a motion to amend its complaint challenging the commissioner's November 4, 1982, decision upholding the deputy commissioner's October, 1982, disapproval of rates contained in the October, 1981, filing. AIM sought to add to its complaint a challenge to the commissioner's December, 1982, approval of rates proposed in the bureau's October 29, 1982, revised filing.

A single justice of this court reserved and reported without decision for resolution by the full court AIM's appeal of the commissioner's December, 1979, decision, AIM's appeal from the commissioner's 1982 decision, and the bureau's appeal from the commissioner's 1982 decision.

## I. *Standard of Review.*

The parties contest the standard of judicial review applicable to claims for review of decisions by the commissioner brought under G. L. c. 152, § 52. The commissioner argues that we must consider only whether his findings have "reasonable support in the evidence." The bureau asserts the commissioner's findings can be sustained only if supported by "substantial evidence."[4] We find no meaningful difference between these two standards of review.

We addressed the standard of review appropriate in a challenge to decisions of the commissioner issued under G. L. c. 152, § 52, in *Westland Hous. Corp.* v. *Commissioner of Ins.*, 352 Mass. 374, 385 (1967). In *Westland,* we reviewed a disapproval of the commissioner's decision by a judge of the Superior Court under G. L. c. 231A. We wrote that in considering the commissioner's factual decisions, "the scope of our review is limited to determining whether the Commissioner's 'findings had reasonable support in the evidence.'" *Id.* at 385, quoting *Insurance Co. of N. Am.* v. *Commissioner of Ins.*, 327 Mass. 745, 753 (1951). We subsequently wrote that in reviewing claims brought under G. L. c. 152, § 52, "[t]he standards to be applied by the Commissioner in approving rates are similar to those in other insurance statutes." *Liberty Mut. Ins. Co.* v. *Commissioner of Ins.*, 366 Mass. 35, 42 (1974). In so stating, we referred to one insurance rate setting statute pursuant to which the commissioner's decision is reviewed on a "substantial evidence" basis, G. L. c. 174A, and another where we have applied the "reasonble support in the evidence" review, G. L. c. 175, § 113B, *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 389 Mass. 824, 828 (1983). We did so because no meaningful

---

[4] AIM suggests that either a de novo hearing, or substantial evidence review is appropriate, depending upon whether we deem approval of rates under G. L. c. 152, § 52, a "regulation" or an "adjudicatory proceeding" within the meaning of G. L. c. 30A. As discussed *infra,* rate approval under G. L. c. 152, § 52, is not subject to G. L. c. 30A. Accordingly, AIM's position is not persuasive.

difference exists between the two standards of review. The term "substantial evidence" arises most prominently in connection with judicial review of agency actions under G. L. c. 30A, § 14 (7). *McCarthy* v. *Contributory Retirement Appeal Bd.*, 342 Mass. 45, 47 & n.2 (1961) (found definition under G. L. c. 30A, § 1, same as at common law). This term is defined in G. L. c. 30A, § 1 (6), as "such evidence as a reasonable mind might accept as adequate to support a conclusion." There is no principled basis for distinguishing between this definition of "substantial evidence" and our "reasonable support in the evidence" standard in the context of claims brought under G. L. c. 152, § 52.

We have noted, however, that the scope of the commissioner's authority under G. L. c. 152, § 52, differs from that under some other statutes. See, e.g., G. L. c. 175, § 113B. The commissioner "may disapprove rates or withdraw his approval only if rates are inadequate, excessive or unfairly discriminatory. He does not have the power to fix rates; 'he may not require that they be at the figures he finds reasonable.'" *Liberty Mut. Ins. Co.* v. *Commissioner of Ins.*, *supra* at 42, quoting *Massachusetts Medical Serv.* v. *Commissioner of Ins.*, 344 Mass. 335, 339 (1962). He must determine whether the rates are inadequate, excessive or unfairly discriminatory, based upon their falling within a "range of reasonableness." Nevertheless, "[t]he burden of furnishing evidence to enable the Commissioner to establish a range of reasonableness is on the insurers." *Id.* If the insurers fail to submit evidence sufficient to allow the commissioner reasonably to conclude, based on the evidence, that proposed rates will not be "inadequate, excessive or unfairly discriminatory" he may disapprove them. Our review of the commissioner's rulings in these cases is limited to whether the evidence reasonably supports his findings that the rates either did or did not comply with the standards set out in G. L. c. 152, § 52.[5] Moreover, in conducting

---

[5] The commissioner's October, 1982, decision recognizes these principles in stating as follows: *"STANDARDS OF REVIEW.* The statutory

this review, we are mindful of the deference due the commissioner's specialized knowledge, technical competence, and experience, regarding issues within the scope of his statutorily delegated authority. See *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 389 Mass. 824, 828 (1983). Cf. *Olde Towne Liquor Store, Inc.* v. *Alcoholic Beverages Control Comm'n*, 372 Mass. 152, 154-155 (1977).

II. *AIM's Appeal from 1979 Decision.*

AIM raises two issues before this court in its complaint for review of the commissioner's 1979 decision. First, it challenges the commissioner's failure to provide a full public hearing prior to his December 31, 1979, approval of rates proposed by the bureau in a filing made following the commissioner's November 6, 1979, disapproval of the bureau's earlier filing. Second, it challenges the commissioner's allowance of the "unlimited payroll" liability exposure base program. The bureau and the commissioner raise several procedural grounds for dismissing AIM's claim for review. We conclude that none of these procedural arguments prevents us from reaching the merits of AIM's complaint for

standards of review, contained in M. G. L. chapter 152, section 52, provide that Workers' Compensation Insurance rates may not be made effective until approved by the Commissioner as not excessive, inadequate or unfairly discriminatory for the risks to which they apply. A rating organization making a filing must provide sufficient information to enable the Commissioner to make such a decision. The Commissioner serves as a rate reviewer, not as a rate maker. The Commissioner reviews the filing submitted. He (or she) does not accept or reject other proposals, but rather uses them as an aid in judging the filing."

Our review of the constitutional issues is, of course, not so narrowly limited. "The plaintiffs are entitled to an independent review of facts and law on the constitutional issue." *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 384 Mass. 333, 346 (1981). "However, such independent review of factual issues does not include the Commissioner's subsidiary findings, but extends only to the Commissioner's ultimate findings and conclusions." *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 389 Mass. 824, 846 (1983).

review as to the two issues before us.[6]  We deny their joint motion to dismiss AIM's complaint.

AIM's first argument proposes that we overrule our conclusion in *Associated Indus.* v. *Commissioner of Ins.,* 356 Mass. 279, 284, 286 (1969), and deem the approval of rates under G. L. c. 152, § 52, "regulations" or "adjudicatory proceedings" under G. L. c. 30A.  In *Associated Indus.* v. *Commissioner of Ins., supra,* we held that such approval involves neither a "regulation" nor an "adjudicatory proceeding" within the meaning of G. L. c. 30A.  AIM presents no argument which warrants reversal of our earlier decision.

---

[6] The bureau asserts, among other arguments, that AIM's appeal from the commissioner's December 31, 1979, decision should be dismissed as moot.  It points out that AIM signed a stipulation providing for the recalculation of rates approved by the commissioner on December 31, 1979, which is the subject of this appeal.  This stipulation provided new offset factors for recalculating "unlimited payroll manual rates."  It also provided as follows:  "Upon approval of such rates, the companies will rerate all policies written to be effective on and after January 1, 1981," and that "the parties waive any appeal with respect to any issue covered by this stipulation."  This stipulation was accepted by the commissioner on February 16, 1982, as part of his decision relative to the offset factors included in his December, 1979, decision.

We agree with the bureau that, by signing the stipulation, AIM has waived its right to appeal the commissioner's December, 1979, decision to the extent it applies to rates effective on or after January 1, 1981.  Nonetheless, the December, 1979, decision purports to apply to rates other than those effective on or after January 1, 1981.  That decision approved rates to become effective on January 1, 1980, as well.  Accordingly, AIM did not waive its rights to appeal the December, 1979, decision to the extent it applied to rates effective between January 1, 1980, and January 1, 1981.

The commissioner argues that in any event AIM's appeal from his 1979 decision is moot as to all time periods covered by rates approved in that decision because an entirely different filing was approved effective January 1, 1983.  He asserts that if we were to find for AIM and rule the rates approved in the December, 1979, decision unreasonable and excessive, we would be limited to a grant of prospective relief.  Whereas these rates are no longer operative, he argues, our decision can have no real effect.  We do not reach this issue, as we find no merit in AIM's claims for relief.

Finally, we do not agree with the commissioner that AIM's failure to prosecute its action requires dismissal of the complaint.

AIM's second argument challenges the unlimited payroll liability exposure base program (unlimited payroll program). In his December 31, 1979, decision approving a rate filing to be effective January 1, 1980, the commissioner approved "the introduction of unlimited payrolls as the measurement of exposure to which the manual rates are applied." The unlimited payroll program for workmen's compensation insurance premiums is a modification of the payroll-based exposure used to set premiums prior to 1980. Prior to the commissioner's December, 1979, order, insurance premiums were calculated by applying the prevailing rate for a risk category to the number of "payroll units" covered by a policy. Each payroll unit was $100 of weekly wages, but no more than three payroll units, $300 of weekly wages, could be attributed to an individual employee in setting premiums. Accordingly, an employer's workmen's compensation insurance rate exposure was limited to $300 of weekly wages per employee. The unlimited payroll program changed this system. While it retained payroll as the base of exposure, it removed the $300 per employee cap for determining premiums. The rates for manual risk calculations were then adjusted so that the total premiums collected by insurers remained approximately the same as under the limited payroll exposure base system. According to the commissioner's November 6, 1979, decision, this change in methodology was "to simplify payroll auditing procedures, to bring Massachusetts in line with the other 45 states who have adopted the program and to permit a more accurate measurement of risk and a more equitable distribution of premiums among risks." He observed in his December, 1979, decision that the unlimited payroll program had been "thoroughly scrutinized and discussed in detail at the public hearing held July 23, 1979 through July 27, 1979."

AIM argues that the unlimited payroll program is unfairly discriminatory under G. L. c. 152, § 52, and its adoption violates the due process and equal protection provisions of the Massachusetts and United States Constitutions. At bot-

tom, AIM's challenge to the unlimited payroll program rests on the position that under this system employers paying higher wages than other employers for the same work will be charged higher premiums, while their employees may not receive any greater benefits than employees of lower paying employers. According to AIM, this situation arises because workmen's compensation weekly indemnification benefits for total incapacity are regulated by statute: "[w]hile the incapacity for work resulting from the injury is total, the insurer shall pay the injured employee a weekly compensation equal to two-thirds of his average weekly wages, but not more than the average weekly wage in the commonwealth . . . ." G. L. c. 152, § 34, as appearing in St. 1981, c. 572, § 1. AIM asserts that two employees performing the same job will receive the same benefits in the event of injury, even though two-thirds of one's salary equals the average weekly wage, while two-thirds of the other's is higher than that, and even though one's employer pays higher workmen's compensation premiums than the other. AIM argues the commissioner erred in approving an exposure base which could lead to such results. We disagree with AIM and uphold the commissioner's rulings.

To review whether the commissioner acted properly under G. L. c. 152, § 52, in allowing the unlimited payroll program, we must focus on whether the program leads to *unfairly* discriminatory rates. As AIM correctly admits, rates are permissible even if discriminatory, so long as they are not unfairly discriminatory. See *Century Cab Inc.* v. *Commissioner of Ins.*, 327 Mass. 652, 664 (1951). Here AIM does not argue that the risk classifications in the rates are unfairly discriminatory, nor does it assert that the unlimited payroll program itself sets up arbitrary classifications. Rather, it asserts that the unlimited payroll program produces results which in fact are unfairly discriminatory when combined with two factors external to the program: the statutory weekly dollar limit on workmen's compensation total disability benefits, and a disparity in wages received by persons within the same risk classifications. If

either of these factors were not present, AIM's allegation of unfair discrimination would be unfounded because there would be, respectively, no equality of benefits for different premium charges, or no employers paying disparate premiums for the same coverage of similarly situated employees.

The commissioner's approval of the unlimited payroll program as not leading to unfairly discriminatory results has reasonable support in the evidence. The bureau presented evidence that the existing limited payroll exposure system was not well suited to wage and benefit inflation. Moreover, AIM's expert witness, Dr. Lena Chang, stated as follows: "It appears that as inflation goes down and that as the statewide average weekly wage increases from year to year there will be higher and higher disparities using the $300 limitation." Dr. Chang acknowledged that some upward adjustment in the $300 payroll exposure limitation would be necessary to keep pace with increases in the average weekly wage. She then admitted that adjusting the payroll exposure limitation every year according to the inflation factor "would not be reasonable." The bureau also provided evidence that its proposed methods of implementing the unlimited payroll program would not increase total premiums collected, because "offset factors" would be applied to adjust rates for risk classifications. Finally, the bureau presented evidence that the unlimited payroll program would simplify payroll auditing procedures and bring Massachusetts in line with the majority of other States.

The commissioner was warranted in concluding AIM failed to present sufficient evidence that the unlimited payroll program would lead to unfairly discriminatory rates. First, the bureau presented evidence that, in workmen's compensation, partial disability indemnity benefits may allow workers earning more than 1.5 times the average weekly wage to collect larger benefits than workers earning less. AIM presented no contradictory evidence. Accordingly, a worker earning more than $300 a week could collect more benefits than someone earning less. Under the $300 limit, however, the extra earnings allowing higher benefits

presumably would not be included in the premium calculation. Therefore, charging higher premiums for higher paid workers could reasonably be found by the commissioner to be related to this risk. Second, AIM presented no documented evidence establishing that individuals within the same risk classification are employed at such disparate wages that employers of similarly situated employees pay premiums which vary independently of job risk and policy benefit levels.

Finally, the commissioner could fairly conclude that AIM's alternative method of adjusting the exposure base is as open to charges of unfair discrimination as is the unlimited payroll program. AIM suggested at the hearing that increasing the cap on payroll exposure units, above $300, will include a larger percentage of total payroll than that covered by the existing cap. It argues this would obviate the need for the unlimited payroll program in keeping pace with wage inflation. Nonetheless, the commissioner reasonably could have concluded that the alleged unfair discrimination based on disparate wages within risk classifications challenged by AIM under the unlimited payroll program would apply here as well. Workers in the same risk classification may receive the same benefit levels while their employers are paying varying premium rates due to different wage scales. Such a situation arguably could arise anytime the average State weekly wage is less than two-thirds of the payroll exposure cap and employers pay more than 1.5 times the average weekly wage.

We find equally little merit in AIM's contention that the unlimited payroll program, for the same reasons it violates G. L. c. 152, § 52, violates due process and equal protection provisions of the Massachusetts and Federal Constitutions. In considering such constitutional claims, we conduct an independent review of the facts and law in question. *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 384 Mass. 333, 346 (1981). AIM asserts that "it would be hard to argue that a finding of 'unfair discrimination' is anything less than a denial of the 'equal

protection of the laws' under the state and federal Constitutions." We need express no opinion about this position as, on an independent review of facts and law before us, we find the unlimited payroll program not unfairly discriminatory.

III. *AIM's 1982 Appeal.*

AIM's second complaint for review pursuant to G. L. c. 152, § 52, challenges the commissioner's November 4, 1982, decision upholding the hearing officer's disapproval of proposed rates filed by the bureau in September, 1981. While the complaint challenges only the November, 1982, affirmance of the October, 1982, disapproval, AIM also seeks review of the commissioner's December 23, 1982, decision. It has filed a motion to amend its complaint to include a challenge to the December, 1982, decision. That December decision, made after a "conference" of the parties, but without a full public hearing, approved proposed rates refiled by the bureau following the hearing officer's October, 1982, decision.

The bureau and the commissioner oppose both AIM's appeal from the October, 1982, decision and its proposed amendment to its complaint. They both filed motions to dismiss AIM's complaint, arguing that AIM has no standing to challenge the commissioner's November, 1982, rate disapproval as it is not a "party aggrieved" by the disapproval within the meaning of G. L. c. 152, § 52. The bureau also asserts that AIM may not challenge the commissioner's December rate approval as AIM did not file a timely complaint and amending the initial complaint would be improper. While these objections to AIM's complaint for review and motion to amend its complaint may be well taken, we need not address them. Most of the issues raised by AIM in its complaint for review and motion to amend also may be raised by it as an intervener in the bureau's appeal from the commissioner's October, 1982, disapproval decision. See *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 611-612 (1983). AIM's motion to intervene in the bureau's action was allowed by the single justice. In its motion to amend,

AIM raises no additional substantive issues relating solely to the commissioner's December, 1982, approval order which are not considered and dismissed in the context of its challenge to the commissioner's 1979 decision discussed *supra*. We therefore deny the motion to amend the complaint, as well as the commissioner's and the bureau's motions to dismiss the complaint. We turn next to the bureau's complaint for review of the commissioner's October, 1982, disapproval.

IV. *The Bureau's Appeal from the October, 1982, Decision*.

The bureau, pursuant to G. L. c. 152, § 52, seeks judicial review of the commissioner's disapproval of proposed rates filed by the bureau in September, 1981. The appeal rests on several allegations of error. The bureau argues that in his October decision the commissioner misunderstood the scope of his discretion under G. L. c. 152, § 52, erroneously ruled the bureau's proposed profit provision would lead to excessive rates, erred in finding the bureau's medical trend procedure would lead to excessive rates, and improperly denied the bureau interim rate relief pending final approval of new, higher rates. As an intervener, AIM raises additional issues. It challenges the commissioner's treatment of the medical cost trend methodology, but on different grounds from those relied upon by the bureau; the commissioner's failure to find a 46% tax rate excessive; and, again, the unlimited payroll program.[7] The proper standard for our review of such claims has been discussed *supra*.

*Profit Provisions*.

The bureau argues that the commissioner erred in his treatment of the bureau's proposed underwriting profit provision. First, the bureau contends "[t]he hearing officer failed to understand the legal and other issues involved in the 'surplus flow' allocation model . . . and therefore wrongly rejected the model as tending to produce excessive rates." Next, the bureau asserts that its proposed beta of liabilities

---

[7] The permissibility of the unlimited payroll program is discussed *supra*. We conclude that AIM has presented no new evidence warranting our reconsideration of the issue here.

coefficient is within the "range of reasonableness" and the commissioner was wrong to find it unjustifiable. Finally, the bureau contends its "simulated loss cash flow is a sophisticated methodological improvement to the profit model" and the commissioner erred in finding it would produce excessive rates. We consider each of the bureau's arguments separately below.

1. The bureau challenges the commissioner's finding that the "surplus flow" model of surplus allocation "can provide for duplicate tax payments by the policyholder which will produce excessive rates." According to the bureau, the commissioner's finding that the surplus flow model would lead to excessive rates was "plainly wrong." We reject the bureau's arguments and conclude that the commissioner's findings are reasonably supported by the evidence.

We have recognized that considering investment income is appropriate in establishing rates. *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 381 Mass. 592, 604-605 (1980). *Attorney Gen.* v. *Commissioner of Ins.*, 370 Mass. 791, 813-816 (1976). To determine how much investment income is earned on a coverage line, surplus of the model company must be allocated among different insurance coverage lines. In *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 389 Mass. 824, 834-837 (1983), we approved the "block flow" model of surplus allocation which allocated surplus equally among coverage lines. In that case, the bureau alleged that the block flow model of surplus allocation is contradictory to "the uncontroverted principle that an investor in a regulated industry is entitled to receive a return on his investment commensurate with returns on investments in other enterprises having commensurate risks." *Id.* at 835 (citing *FPC* v. *Hope Natural Gas Co.*, 320 U.S. 591, 603 [1944]). It then argued that its proposed "surplus flow" model of surplus allocation was required by law because "it is the only model that provides for equal rates of return for the different coverages." *Id.* We rejected the bureau's argument. We found there that even if the *Hope*

principle were applicable to rates of return among discrete lines of coverage within the same regulated industry, the block flow model of surplus allocation is not impermissible, at least absent a finding that the actual riskiness of all lines of coverage is identical and that the block flow model results in different rates of return. We noted also that applying an average beta of liabilities coefficient to all lines was not a finding that all lines actually were equally risky. *Id.* at 837. The bureau's reply brief in this case concedes that the "surplus flow" model of surplus allocation is not required by law. It argues instead that "assumptions that comply with the economic and legal principles of the *Hope* case must be reasonable and therefore cannot be disapproved under § 52." Even if we agree with this proposition, it does not help the bureau's position. While the bureau does not explicitly so state, we assume it intends this statement as support for a finding that the surplus flow model is reasonable and should have been allowed by the commissioner.[8] There is reasonable support in the evidence for the commissioner to decide otherwise.

The bureau proposes a surplus flow method of surplus allocation which "allocates surplus among coverages in proportion to the reserves on each coverage so that the ratio of premium to surplus allocated to each coverage varies with the amount of reserves on that coverage and thus varies with the length of the cash flow." The hearing officer reviewed the bureau's surplus flow model and found that it might lead to duplicate taxes and therefore to excessive rates. The

---

[8] The bureau stresses in this context that the block flow model is unreasonable. It points out that when the block flow model is used with an average beta estimate for all coverage lines, different rates of return result for each. The bureau's argument apparently is that this result of the block flow model when used with an average beta violates the economic assumptions of the *Hope* principle and therefore is unreasonable. The flaw in the bureau's reasoning on this point was pointed out in our *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 389 Mass. 829, 837 (1983), decision. The average beta estimate attributed for all lines of insurance is not a finding that all lines are actually equally risky. This was in part the basis of our finding that the block flow model did not violate principles established in the *Hope* case.

bureau admits in its brief that allocation of surplus among lines is a way of "allocating *taxes* among various lines." This allocation of taxes is significant as the commissioner could find that the model relied upon for determining a fair premium includes in its computation the present value of taxes on investment income. He also reasonably could find, therefore, that the amount of surplus allocated to a line of coverage will reflect the amount of investment income and related taxes attributable to that line. Under this approach, the greater the surplus, the greater the investment income and the greater the taxes on the income which may be included in determining a fair premium. The hearing officer's main concern was that by allocating, under the surplus flow methodology, more surplus to the workmen's compensation coverage, policyholders would be paying for taxes incurred on income derived from surplus which is allocable to other coverage lines and for which companies in fact are already being compensated under policies for other coverages. The bureau objects that the surplus flow method cannot cause policyholders under differing lines to pay for tax incurred on the same investment income because the model is "systematic" and "the surplus allocated to each policy on each line is proportional at each moment in time to the outstanding losses on that policy."

The commissioner's failure to find that the surplus flow methodology would lead to "not excessive" rates has reasonable support in the evidence. There was evidence that allocation of surplus according to reserves of coverage lines is not a well-refined method of surplus allocation. The bureau itself admits that "a company's total surplus is not in fact or in law allocated to particular coverages or states." Therefore, the technique of allocating the tax burden among coverage lines based on reserves for each arguably rests on a model for predicting underwriting profits created for the purposes of rate setting alone. Moreover, there was some evidence that the surplus flow methodology does not produce results fully consistent with its premises. The basic premise of the surplus flow methodology as applied to work-

men's compensation insurance is that such insurance is more risky than other types and therefore requires a greater allocation of surplus. There was evidence, and the bureau's witness, Dr. Richard Derrig, suggested that as a riskier line, the premium to surplus ratio on this line should be lower than the two to one general industry average. Nevertheless, as the commissioner points out, there is evidence suggesting a 2.05 to 1 premium to surplus ratio exists for companies writing a high percentage of workmen's compensation policies. The commissioner reasonably could conclude that the bureau has not fully rebutted this evidence. In addition, Dr. Mahler, an expert witness testifying for the SRB, stated that while a correct surplus flow calculation may be developed, it has yet to be presented.

Finally, the bureau directs us to no part of the record where it presented facts which reasonably required the commissioner to find that taxes included in premium calculations based on its new surplus flow model are not taxes which may be allocable to other lines and are in fact already included in premiums established for those other lines. It has not presented evidence requiring the commissioner to conclude that taxes assessed under the surplus flow methodology would not be for income derived from surplus attributable to other lines. The commissioner, therefore, reasonably could be and was unconvinced that rates based in part on such an allocation of taxes would not be excessive. As the bureau points out, we have declared it inappropriate to justify excessive or inadequate rates for a specific coverage line based upon the profits or losses incurred by other lines. *Insurance Rating Bd.* v. *Commissioner of Ins.,* 359 Mass. 111, 116 (1971). *Aetna Casualty & Sur. Co.* v. *Commissioner of Ins.,* 358 Mass. 272, 280 (1970). These principles, however, have no application here. The commissioner did not err in acknowledging as fact that policies and rates for other coverage lines exist when he was assessing the bureau's proposed methodology for creating a range of reasonableness. Such recognition of other coverage lines is inherent in establishing an average beta coefficient,

which we have deemed permissible. *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.,* 389 Mass. 824, 835-837 (1983). It is even necessary in the surplus flow model of surplus allocation proposed by the bureau.

2. The bureau next contests the commissioner's finding that "[t]he Bureau has not provided justification for the choice of a -.42 underwriting beta, which would result in higher rates than the -.16 used in accepted rates." According to the bureau, it presented evidence establishing a range of reasonableness including a "wide range of estimates" into which its estimate fell. It argues, therefore, that the commissioner had no authority to disapprove the proposed estimate.

We have addressed the concept of the "beta of liabilities" in the past. In the insurance rate setting context, "[t]he beta of liabilities is used as a measure of how investors view the specific riskiness of underwriting" insurance coverages as compared with "investing in the average unregulated company." *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.,* 389 Mass. 824, 835-836 (1983). The beta of liabilities concept has arisen in Massachusetts insurance rate setting as a factor in the capital asset pricing model (CAPM) used for calculating underwriting profit allowances for coverage lines. See *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.,* 384 Mass. 333, 341 (1981); *Attorney Gen.* v. *Commissioner of Ins.,* 370 Mass. 791, 812-816 (1976). The CAPM is a methodology for projecting returns to insurers, adjusted to account for "systematic risks" of investment, which the commissioner has adopted in setting automobile insurance rates and we have allowed. *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.,* 384 Mass. 333, 342 (1981).[9]

---

[9] We have described "systematic" and "unsystematic" risk as follows: "'Systematic' risk measures the risk of variability of return on a market portfolio consisting of all available assets; 'unsystematic' risk is that part of an asset's risk unique to the asset, that is, risk not shared with all other

The commissioner found that the bureau used a -.42 beta of liabilities in its filing. Its choice of such a high negative value beta seems based primarily on three grounds. First, it argues that the beta value employed by the commissioner in the automobile rate setting cases is an inadequate measure of risk. It stresses here, as the rating bureau did in *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 384 Mass. 333, 342 (1981), that the beta of liabilities employed by CAPM measures "systematic" but not "unsystematic" risk. It argues that when all relevant risk factors are included, systematic and unsystematic risk, the negative value for beta should be higher than that used by the commissioner in the automobile insurance cases. Second, the bureau argues that workmen's compensation insurance is more risky than other coverage lines. Finally, the bureau states that "differences in estimates of 'beta' are meaningless to most people," that the importance of using a beta estimate is to establish an appropriate rate of return to investors underwriting insurance, that fluctuations in beta estimates do not dramatically change rate levels and, therefore, that "[d]ifferences in the estimated betas of twenty or more hundredths of a point are well within the range of inherent error in the [risk] estimation process."

The deputy commissioner was not convinced by the bureau that its choice of a -.42 beta estimate was within the range of reasonableness and would produce "not excessive" rates. She stated that, "After reading all the literature provided to me on this subject, I find very little to feel secure about in the Bureau's selection of Beta-sub-L." She was particularly uncomfortable with the distribution of beta of liabilities estimates provided by the bureau. She noted that the two ends of the distribution were based on measures of different risks: "one is the Beta of a particular company; the other is a weighted average of Betas of companies, in-

assets." *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 384 Mass. 333, 342 (1981).

cluding the other end figure." The deputy commissioner suggested that a reasonable beta might include some measure of "unsystematic" risk and therefore be more negative than -.16. She found, however, that insufficient evidence was provided for her to justify approval of a -.42 beta of liabilities.

The commissioner's decision upholding the deputy commissioner's findings has reasonable support in the evidence. First, the commissioner fairly could conclude the bureau presented insufficient evidence to support its argument that a -.42 beta of liabilities is reasonable because calculations of "unsystematic risks" require a beta of higher negative value in workmen's compensation underwriting than that provided for in the automobile context. The bureau stated that calculations of unsystematic risk result in higher risk estimates than beta measurements and that it "decided to select a reasonable value from this range [between estimates including unsystematic risks and the CAPM beta estimates]." As the commissioner points out, the bureau's choice of this reasonable value was made by taking the rate of return sought by the bureau for underwriting workmen's compensation policies and then calculating which beta value would provide for it. Such a methodology for determining the beta of liabilities frustrates the purpose of the CAPM. Part of the purpose for adopting the CAPM in insurance rate making was to account more completely for investment income in setting fair premiums. See *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 384 Mass. 333, 341 (1981); *Attorney Gen.* v. *Commissioner of Ins.*, 370 Mass. 791, 812-816 (1976). Accordingly, seeking to justify a beta of liabilities estimate by focusing on a general target rate of return on underwriting which may not include all investment income arguably is inappropriate. More importantly, however, the bureau directs us to no evidence in the record explaining how calculations of a beta of liabilities based on "systematic risk" and a beta of liabilities based on "unsystematic risk" may be compared with each other for the purpose of deter-

mining a range of reasonableness where both calculations for beta apparently are based on differing risk assumptions.

Second, the bureau has produced no convincing evidence that underwriting workmen's compensation insurance is more risky than underwriting other lines. It states in its brief that at the hearing "there was little empirical or quantifiable work on the risk of separate lines . . . ." It relies instead on the assertion that "insurance folk wisdom, as expressed by regulators and others, regards the workers' compensation line as a line of more than average risk." This evidence does not require the commissioner to find that underwriting workmen's compensation lines is sufficiently more risky than underwriting other lines to warrant a significantly higher negative beta of liabilities.

Finally, the bureau's assertion that a higher negative value for beta is reasonable because its effect on the rates will, in its opinion, be small does not warrant a finding that the proposed beta is within the range of reasonableness. Rather, this argument suggests that the beta value as a basis of calculation is meaningless. Further, the bureau suggests that because other estimates are allowed to fluctuate, "straining after precision" in beta estimates is impermissible. We find these arguments have little bearing on the commissioner's conclusion that he was not presented with sufficient evidence to determine the beta would lead to "not excessive" rates.

3. The bureau next contests the commissioner's finding that the simulated loss cash flow methodology proposed by the bureau would lead to excessive rates. The bureau proposed a new method of predicting loss cash flow based on current statutory benefits and injury distributions. The bureau asserts that this new simulation method for calculating loss cash flow is preferable to loss cash flow estimates based on past experience because its predictions are based on current data rather than on historical trends. The deputy commissioner did not state directly whether she felt that the simulated loss cash flow methodology was a "sophisticated ratemaking innovation" as the bureau suggests. Rather, she

found that the loss cash flow estimates proposed by the bureau and based on the methodology were unacceptably imprecise. According to the deputy commissioner, these estimates resulted in a considerably faster rate of payment on claims and, consequently, more positive profit provisions, than would be warranted by actual observed data. She found the proposed loss cash flow would lead to excessive rates.

The commissioner's decision has reasonable support in the evidence. One SRB witness testified that when tested against historical data the "predictions of the new loss flow are very different from the observed data." Another SRB witness testified that when the simulated loss cash flow model is used to predict payments for a period during the 1970's, "the actual amounts paid out are very substantially lower than the ones that are estimated by the cash flow based on simulation." The commissioner could reasonably conclude that the bureau presented insufficient evidence to rebut this testimony. We have recognized the difficulties involved in developing trend methodologies for projecting loss cash flows. *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 389 Mass. 824, 838-841 (1983). Here, however, the testimony reasonably supports the commissioner's finding that the predicted loss cash flow proposed by the bureau based on simulated loss cash flow would lead to excessive rates.

*Medical Cost Trends.*

1. In addition to the commissioner's findings regarding the profit provision, the bureau challenges his one finding under the loss and expense provisions. The commissioner found that "use of the elasticity model in trending medical costs was without merit and will produce excessive rates." According to the commissioner, "the so-called 'elasticity' model was without merit, primarily because of its low coefficient of correlation, and particularly because two other models were available which were shown to fit the data very well." The bureau claims the commissioner erred in so finding.

In estimating the medical care costs insurers would incur during the period covered by the proposed rates, the bureau

states it "utilized a comparison between the trends in historical data showing the average medical claim costs incurred under the workers' compensation system and the trends in a governmental index of medical costs, in this case the Boston Medical Care Index." The bureau refers to this methodology as "internal/external trend analysis." One such comparison used by the bureau in its analysis was the "elasticity" model which "compares the annual *changes* in the average claim cost data with the annual changes in the index." The bureau admits that the elasticity model does not fit the data as well as the other models it presents. It predicts a higher cost trend and has a lower coefficient of correlation with historical data than the other models. Nevertheless, the bureau argues that the elasticity model presents useful information for projecting cost trends. The bureau first argues that projecting medical cost trends is speculative and no precise conclusion may be drawn; the future costs may or may not fit historical trends. Second, the bureau claims that medical care costs have been greatly underestimated in the past and, therefore, including high estimates in the projection is not unreasonable. Finally, the bureau contends that the elasticity model estimates are only one set of estimates included in the over-all projected medical care costs and increase the rate levels by only .1%. In conclusion, the bureau states, "[T]he hearing officer's disapproval of the filing because she concluded that one limited aspect of the medical trend calculation was wrong, is wholly unjustified."

We conclude the evidence reasonably supports the commissioner's decision that the bureau's elasticity model as applied to medical cost trends would lead to excessive rates. The commissioner was presented with three methods for predicting medical cost trends. Two correlated closely with historical trends; the elasticity model did not. One of the bureau's witnesses implicitly recognized the problems with the elasticity model. He stated that the two models which best fit the historical data were used in two methods for calculating over-all claim cost for all injury kinds combined:

"one by looking at each injury kind separately and combining them; and two, by looking at all injury kinds combined." The elasticity model, however, was used for only one of these computations: combined injury analysis. It was not used in the method of "looking at each injury kind separately and combining them" because "the values produced by that approach were unduly influenced by movements in the serious injury kinds." This suggests that even proponents of the model were aware of its limitations. Nevertheless, they pressed for its use in analyzing "all injury kinds combined" while finding it inappropriate for analyzing "each injury kind separately and combining them." No direct evidence was presented showing why the admitted impropriety of using the elasticity model in one method of analyzing over-all cost claims for all injuries was not equally applicable when analyzing the same over-all cost claims through a different method.

This selective use and admitted weakness of the elasticity model raises legitimate concerns about whether the bureau has presented sufficient evidence to establish that the medical cost trend based upon it falls within a range of reasonableness. The bureau asserts that evidence presented at the hearing shows the elasticity model increases rate levels by .1%. The bureau seizes upon this point to state that even if the elasticity model projects medical costs higher than they are likely to be, the commissioner cannot disapprove the filing based alone on this .1% "excess." We cannot agree with the bureau's assertion. General Laws c. 152, § 52, allows the commissioner to disapprove filings which propose rates which are excessive. The statute does not require the commissioner to approve elements of filings which would lead to rates falling within a range of excess, no matter how small. The commissioner's decision disapproving rates needs only to be reasonably supported by the evidence that the proposed filing will fail to produce rates which are not excessive, or will result in inadequate or unfairly discriminatory rates. We conclude that the commissioner's decision on this issue is reasonably supported by the evidence.

2. AIM also challenges the medical cost trend methodology. It claims the commissioner erred in not finding the medical cost trend methodology, other than the elasticity model, as likely to produce excessive rates. The commissioner rejected AIM's contention: "AIM argued that the rate of growth of total physician and hospital charges should track the rate of change in the Rate Setting Commission's allowed charges for known procedures even if they have not done so in the past. I think this is a poor argument." The commissioner observed that some new and developing medical technologies would not be considered under AIM's method and that the bureau's trending methodologies, other than the elasticity model, fit the historical data fairly well. The commissioner fairly could find that AIM failed to rebut this evidence adequately. We conclude that the commissioner's failure to disapprove the bureau's medical cost trend methodologies other than the elasticity model was reasonably supported by the evidence.

*Investment Tax Rate.*

The commissioner found that the bureau assumed a 46% Federal income tax rate for calculating its proposed rates in its October, 1981, filing. The commissioner found that "[t]he proposed investment tax rate of 46% is the maximum possible," but that it was not considered to produce excessive rates. AIM challenges this finding that the 46% tax rate would not lead to excessive rates. AIM relies primarily on our approval in *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 389 Mass. 824, 833 (1983), of the 28% effective tax rate used by the commissioner in fixing automobile rates. AIM essentially contends that because we upheld an effective tax rate in setting automobile insurance rates, we must deem unsupported by the evidence the commissioner's approval of a 46% income tax rate in workmen's compensation rate setting. The commissioner's role under G. L. c. 152, § 52, however, differs from that under G. L. c. 175, § 113B. Under G. L. c. 152, § 52, the commissioner allows only proposed rates which he finds, based on the evidence, not excessive, inadequate, or

unfairly discriminatory. The commissioner does not fix rates as he does under G. L. c. 175, § 113B. Therefore, he may not disapprove an element of a filing simply because he would use a different one where both fall within a range of reasonableness. See *Liberty Mut. Ins. Co.* v. *Commissioner of Ins.*, 366 Mass. 35, 42 (1974). In using a 46% investment tax rate for establishing rates, the bureau has followed a methodology employed by the commissioner in the past in arriving at the net investment profit figure under the statutory/regulatory company model. *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 389 Mass. 824, 828-829 (1983). We have approved the use of such hypothetical tax rates in insurance rate setting. *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 381 Mass. 592, 608-609 (1980). AIM has presented insufficient evidence to establish that this hypothetical tax rate falls outside the range of reasonableness in the context of the statutory/regulatory model. We conclude that the commissioner had reasonable support in the evidence to approve this hypothetical 46% income tax rate for use within the context of the statutory/regulatory company model.

*Award of Interim Rate Relief.*

The bureau's last claim is that it should be allowed to charge policyholders, for the period between April 1, 1982, and January 1, 1983 (the interim period), a premium reflecting the 15.9% rate increase allowed and effective after January 1, 1983. The bureau rests its claim that it should be allowed to collect additional premiums on both statutory and constitutional grounds. The bureau's statutory argument is as follows. First, it suggests that because G. L. c. 152, § 52, does not specifically preclude the commissioner from allowing interim rate increases, the commissioner has the implied power to grant them. Next it claims that even though parties can apply to the court for such relief, allowing the commissioner to grant relief would be preferable. The bureau then asserts that in the context of this case the commissioner was required to grant interim relief. It notes

that six months elapsed between the time it filed its proposed rate change and when public hearings on the filing commenced. Allegedly because of this time lapse, the bureau then filed for a 25% interim rate increase which was denied by the commissioner. The bureau now states that this six-month delay in commencing hearings combined with the time between the hearing and decision caused it to suffer special harm. It argues that the approval by the commissioner of a rate increase of 15.9% to become effective January 1, 1983, confirms its argument that it is entitled to recover money it was unable to collect for the interim period: "The commissioner *found*, based on the hearing officer's Decision of October 15, 1982 and his decision of December 23, 1982, that the rates had been deficient by at least 15.9 per cent." According to the bureau, the 15.9% "deficiency" in rate levels between October 1, 1981, and January, 1983, represents approximately $57,000,000 in lost revenues.

The bureau's analysis is erroneous. The bureau does not direct us to any place in the record where the commissioner found that rates existing at any time prior to January 1, 1983, the effective date of the new rates, were inadequate. Moreover, as the bureau pointed out in connection with AIM's motion to amend its complaint, the decision of the commissioner to approve rates effective January 1, 1983, may not properly be before this court on a complaint to review the October 15, 1982, disapproval order. Even if it were proper, however, the bureau directs us to no case where approval of new rates alone requires a finding that existing rates, in effect prior to approval of new rates, were inadequate for the period during which hearings on new rates were being held and considered.

The bureau next, and finally, claims the commissioner's denial of interim rate relief and his delay in holding a hearing on the proposed rates "deprived the Bureau and its members of procedural and substantive due process" in violation of the Massachusetts and Federal Constitutions. In considering these constitutional arguments, we apply a dif-

ferent scope of review from that which we apply when considering claims that the commissioner failed to comply with the standards for approval in G. L. c. 152, § 52. See *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 384 Mass. 333, 346-347 (1981). Our decisions direct us to make an independent review of the commissioner's ultimate findings of fact and conclusions as well as to undertake our traditional review of legal issues. In *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 389 Mass. 824, 846 (1983), we described this scope of review in detail.

The bureau's first constitutional challenge is one of confiscation. According to the bureau, "the hearing officer's failure to approve interim rate relief amounted to an unconstitutional confiscation of the companies' property." The bureau's argument apparently is that rates in effect between the date it filed its proposed new rates in October, 1981, and the commissioner's approval of new rates to be effective in January, 1983, were impermissibly low and the commissioner acted improperly in not rectifying the situation by ordering higher interim rates. The bureau's argument is without merit. As an initial matter, it signed a stipulation concerning the rates in effect for the period in question which waived the right to appeal the rates. Whereas this claim of unconstitutional confiscation is founded on rates which were based in part on the stipulation, the bureau arguably has waived its right to challenge the adequacy of these rates. More importantly, however, the bureau's claim of confiscation rests on the identical arguments made in asserting the commissioner violated G. L. c. 152, § 52, in not granting interim relief. We concluded in response to that statutory challenge that the bureau failed to present sufficient evidence warranting, much less requiring, a finding that the rates in effect between October, 1981, and January, 1983, were impermissibly inadequate for that period. Similarly, we conclude here that the bureau presented insufficient evidence to warrant our deciding that the rates in effect during that same period were unconstitutionally confiscatory.

The bureau's second constitutional claim is that the commissioner took too long in acting on its October, 1981, filing of proposed rates. It argues that the six-month period between its October, 1981, filing of proposed rates and the commissioner's scheduling of hearings on them in March, 1982, coupled with the seven-month period between commencement of the hearings and issuance of the hearing officer's disapproval, "was excessive and deprived the plaintiffs of both procedural and substantive due process and resulted in inadequate rates for the period October 1, 1981 to January 1, 1983." Unjustified delays in acting on proposed rates may in some circumstances constitute a denial of procedural due process. Cf. *Warner Cable of Mass., Inc.* v. *Community Antenna Television Comm'n*, 372 Mass. 495, 500 (1977); *Boston Gas Co.* v. *Department of Pub. Utils.*, 368 Mass. 51, 54 (1975); *Smith* v. *Illinois Bell Tel. Co.*, 270 U.S. 587, 591 (1926). Nonetheless, the record does not support the bureau's claim that the time periods involved here constitute excessive, or were intentional, delays. While the Legislature has set time limits for consideration of other types of proposed rates, see G. L. c. 174A, § 6; G. L. c. 176A, § 6, it has not put time restrictions on the commissioner in connection with the approval of proposed workmen's compensation rates. Accordingly, we must measure the alleged delay here against a less well-defined standard than exists under other statutes. The bureau has presented us with no case indicating that a six-month delay in calling a hearing on proposed rates is excessive. Moreover, the length of time taken to review and approve or disapprove a filing of proposed rates necessarily must be viewed in light of the complexity of the issues raised by the filing. The hearings on the filing here were complex and time consuming. Several parties, other than the commissioner, participated in hearings which extended through thirty-seven sessions from April 15, 1982, to July 2, 1982. Each had the opportunity to present witnesses, challenge and seek to amend the bureau's proposed rates, and examine the statistical and documentary evidence. In addition, the bureau

proposed several new methodologies in calculating its proposed rates which reasonably may have required additional time for consideration, both by the parties and the commissioner. We conclude, therefore, that the time taken in scheduling this lengthy hearing along with the time taken to hear and decide upon the issues raised in it were not so excessive as to violate the procedural or substantive due process provisions of the Massachusetts or Federal Constitution.

*Conclusion*

AIM's motion to amend its complaint challenging the October 15, 1982, decision is denied, as are the bureau's and the commissioner's separate motions to dismiss the complaint, and their joint motion to dismiss AIM's complaint for review of the December 31, 1979, decision. Judgment shall enter in the county court affirming the commissioner's December 31, 1979, decision and the deputy commissioner's October 15, 1982, decision, as well as the commissioner's November 4, 1982, approval of it, on all challenged matters.

*So ordered.*